**UNITED STATES DISTRICT COURT**
**DISTRICT OF MASSACHUSETTS**

|  |  |  |
|---|---|---|
| Mark Saunders, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | Civil Action No.  1:07-CV-12365-RWZ |
| Home Depot USA Inc, | ) | |
| a Delaware Corporation | ) | |
| Defendant. | ) | |
| | ) | |

## FIRST AMENDED COMPLAINT

COMES NOW the Plaintiff, appearing pro se, and for a complaint against Defendant, states and alleges as follows:

### Parties

1.  Plaintiff is a resident of the city of Watertown, county of Middlesex, Commonwealth of Massachusetts. At all times pertinent hereto, Plaintiff was employed by Defendant. Plaintiff at all times was employed by Defendant at locations in Massachusetts.

2.  Defendant is a corporation existing under and by virtue of the laws of the state of Delaware, with primary offices in Atlanta, Georgia. Defendant operates Home Depot and EXPO Design Center stores throughout the United States, including the Commonwealth of Massachusetts. Defendant operated both Home Depot and EXPO Design Center stores in Massachusetts at which Plaintiff was employed.

### Jurisdiction and Venue

3.  This Court has jurisdiction pursuant to 28 U.S.C. §1331 and §1338(a), and 17 U.S.C. § 101 *et seq*. The FLSA authorizes court actions by private parties to recover damages for violation of the FLSA's wage and hour provisions. Jurisdiction over Plaintiffs' FLSA claims is based upon 29 U.S.C. § 216(b) and 28 U.S.C. § 1331.

    This Court has jurisdiction over Plaintiffs' claims for breach of contract, quantum meruit and violations of Massachusetts General Law, **Chapter 149: Section 148**, *et. seq.*, pursuant to 28 U.S.C. § 1367, in that the state claims are so related to the FLSA claims that they form part of the same case or controversy.

4.  Venue is proper in the District of Massachusetts pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events giving rise to this action occurred in this District

and a substantial part of the property that is the subject of this action is situated in this District. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b) and (c), because Defendants do business in this district and a substantial part of the unlawful conduct giving rise to the claims occurred in this district. Venue in this district is proper pursuant to 28 U.S.C § 1400(b) because defendant has committed acts of infringement and has a regular and established place of business in this district.

## Nature of the Case

5. Plaintiff was employed by Defendant from April 1, 1998 through 18 December, 2004. Plaintiff performed several tasks for Defendant after termination on the condition of re-employment and remuneration.

6. Plaintiff relied on Defendant's Standard Operating Procedures Manual, Associate Handbook, Ethics posters, training classes, pamphlets, and Open Door Policy as his basis of conduct.

7. In 1999, while employed in the Kitchen Design Department at the Home Depot in Natick, Massachusetts, Plaintiff became aware of a deliberate double billing scheme involving his manager, Raghu Agawal, and J&J Contracting. J&J Contracting was a general contractor utilized by the store to install kitchens and baths. Plaintiff had initially called Gus Ramano of J&J Contracting to reverse the double billing as Plaintiff thought it was done in error. Mr. Ramano informed Plaintiff that Assistant Manager Raghu Agawal had allowed the billing practice. Plaintiff immediately notified Agawal, as Agawal was the manager over the department. Mr. Agawal's response was to instruct Plaintiff to "stop turning over rocks or I'll turn one over on you!." Plaintiff filed a complaint regarding Mr. Agawal's comments, as he took them as a physical threat. Plaintiff reported the double billing scheme to Store Co-manager Steve Allen, who handled the investigation. Mr. Allen confirmed the allegations, and informed Plaintiff that customers had to be refunded as a direct result of the over-billing. Plaintiff did not have privilege to any information regarding disciplinary action. Mr. Agawal was later transferred from the store.

8. Plaintiff was promoted to the position of Store Project Manager, a new position created under the auspices of the Home Depot Best Practices Program and designed after the EXPO Design Center concept. Company founder Arthur Blank was given a tour of the center shortly after its opening and Plaintiff was invited on the walk with him through the Natick store. Blank discussed this program with Plaintiff, and commended Plaintiff for his work in creating the center and for his record sales. Plaintiff was presented with a letter of achievement signed by Mr. Blank. The program was so successful that management from other regions visited the Project Management Center and interviewed Plaintiff to replicate the program in their stores. Plaintiff amassed several customer satisfaction letters throughout his employment with Defendant. Plaintiff was rated as a "4" (of 5) by his Store Manager, Craig Falconer.

9. Plaintiff was asked to head up the store's Employee Committee, and to participate in Senior Staff Meetings.

10. Plaintiff was solicited by EXPO Design Center Store Management in early 2000, and transferred to the Burlington EXPO in June of that year to assist in completing the store.

Plaintiff's title at EXPO was Project Superintendent. Plaintiff also helped open the Braintree location some time later.

11. In early 2001, Plaintiff was asked to photograph work sites with his own equipment, and perform digital enhancement at home with his own computer and software. He was asked to print pictures with his own equipment for displays in the store. (The EXPO store did not have equipment to do any photographic or video work.) Plaintiff was asked to keep track of his hours, as he would be paid. This request initially came from his manager, Tracy Talbot and Store Manager Jack Racine. However, the scope of work quickly expanded, as the Corporate Office in Atlanta began to take notice and became interested in displaying EXPO projects nationally. Several of the photo shoots were performed outside of the course of the regular workday, as Plaintiff had his regular duties to perform during regular work hours. The scope of the work expanded to include the following:

   a. In-store displays
   b. Story Board displays (which were adopted nationally after the President of EXPO Elaine Vercheran came to the store with Senior Manager of National Marketing and Advertising Jerry Carbone and were shown the displays)
   c. Comprehensive videos of various EXPO projects (Played at EXPO Home Shows, at the EXPO Design Desk to attract new customers, and throughout the store)
   d. Photo collection for EXPO President Elaine Vercheran
   e. The Boston Globe Sunday Magazine
   f. Ketchum Public Relations (a vendor of EXPO)-Sue Melia, Jessica Reigle
   g. The EXPO Marketing Department – Jerry Carbone
   h. The EXPO Public Relations Department – Lori Pugh, Andrea Bartlett
   i. Estelle Guralnick (Regional Editor – Traditional Home, Architectural Digest, Better Homes and Gardens)
   j. EXPO Designers individual portfolios
   k. EXPO Home Show displays (approx 4' X 6' Photo montages, framed pictures, videos, etc.) This amounted to hundreds of large printed photographs and videos.
   l. Jennifer Dryburgh (PR Agent for Silestone, an EXPO vendor)
   m. Various EXPO print advertising "tabs" (mailers to customers)
   n. Caragh M. Whalen (independent Public Relations agent for EXPO)
   o. Karen R. O'Neil (KO Strategic Communications)
   p. EXPO web site.
   q. The EXPO Burlington Store Portfolio
   r. The EXPO National Portfolio
   s. Brochures for distribution to customers (Design Desk, Service Desk, Points of Sale) This work was based on similar advertising Plaintiff had developed for the Project Management Center at the Natick Home Depot.

12. Plaintiff continued this work, submitting the hours for payment. After several delays by Talbot, Plaintiff raised the issue to store management, and was given assurance that the hours would be paid. Store Manager Jack Racine was later removed for disciplinary reasons not related to Plaintiff or his work.

13. Several questionable actions began to arise as EXPO projects developed. Manager Tracy Talbot bypassed protocol on a regular basis, giving rise to problems on the job. Particularly, starting jobs without all materials on site, which caused delays as jobs were shut down to wait for materials. It was more important to her to "get the job sold and

started" to meet numbers. Meetings defined under the Design Standard Operating Procedures and several training classes were bypassed or combined to hasten the process. This led to not only customer complaints, but complaints from several Project Superintendents who were left to deal with the issues caused by Talbot bypassing protocol. In particular, a new contractor, Precision Concepts was being favored by Talbot in job selection; although their bids were not in line with EXPO guidelines and it was determined that Precision was not pulling permits. (Customers were being charged for the permits.) Talbot was passing instruction through Project Superintendent Department Head Richard Marion. Marion, under Talbot's direction, began to pressure Plaintiff to disregard all permit issues and follow their instructions that permits would not be obtained.

14. Talbot became extremely abusive toward Plaintiff and others, using extremely foul language, screaming, and refusing to meet with subordinates. Plaintiff complained to Store Management concerning the lack of permits on projects and extremely abusive treatment he was receiving from Talbot. Customers continued to provide positive written feedback regarding Plaintiff's work.

15. On April 1, 2001, Plaintiff was to receive a Merit Review and raise. In lieu of these, Plaintiff received a small raise with no Merit Review or explanation for the raise. After requesting the review several times to no avail, Plaintiff filed successive complaints with:
    a. Store Human Resources Manager Elaine Steen on May 1, 2001
    b. Human Resources Manager Gary Brown on June 15, 2001
    c. In writing to Brown on June 27, 2001
    d. Human Resources District Manager Tracy Graddy on August 1, 2001.

The review was finally given by Talbot in August of 2001, four months late and without any justification for the low raise.

16. It is notable that Plaintiff's raises prior to working for Talbot averaged approximately 35% per annum. While working for Talbot, raises dropped to approximately 3.6% per annum (with most of that being a 5.9% raise prior to Plaintiff's complaints of permit violations). Examples of raises under Talbot were 25 cents, 20 cents, and 30 cents. After Plaintiff was transferred from Talbot's management, his raise level increased to 22.33% with a promotion, plus yearly bonus, stock options, and increased benefits.

17. Shortly after the review, Human Resources District Manager Tracy Graddy contacted Plaintiff and said that she was looking into the matter of the review. She told Plaintiff that she "would get back with him at the beginning of the week." The call never came. Plaintiff introduced himself to Graddy several weeks later when she was in the store.

18. On August 9, 2001, Plaintiff discussed permit issues with Corporate personnel. In particular, Natalie Dalton and David Acree, who provided training and direction to store personnel regarding project design and installation procedure. Dalton and Acree both instructed Plaintiff that permits were indeed required.

19. On August 9, 2001, Plaintiff also met with District Manager Robert Cook (who was acting as interim Store Manager after the removal of Racine) to discuss Plaintiff's concerns regarding permit violations on the McCullum project in Charlestown, MA.

expenses. Assistant Manager Lou DePamphillis told Plaintiff that Human Resources District Manager Tracy Graddy had made the accusation that he and Talbot had set up the transfer to get rid of Plaintiff. The transfer had been offered after Plaintiff was not promoted to Design Department Supervisor, although ranked a 4 and marked as "Promotable".

28. In 2002, Store Manager Tim Brown tendered his resignation and was replaced by Store Manager Tony Verterami. Verterami utilized Plaintiff's customer service experience and talents to handle several severe customer issues ("Ben Hill's, as Home Depot refers to them).

29. On February 15, 2003, Plaintiff was commended by Verterami for Photo and Video Work, after receiving praise of Plaintiff's work by the President of EXPO, who was visiting the site. The President of EXPO had commented errantly on the work of the HDTV team in developing the video. Verterami told the EXPO President that it was actually Plaintiff who had developed the video.

30. Also in February of 2003, Plaintiff was commended by Verterami in a store meeting for amassing $50,000 in sales on the last afternoon of the quarter. Verterami had called Plaintiff to his office and asked him to stay that afternoon to try to meet the stores quarterly planned sales goal.

31. In March, 2003, Plaintiff discussed the matter of photo work pay with Verterami. Plaintiff told Verterami that he would continue to provide brochures to the store, but that he would no longer do photo work without compensation. Verterami agreed, and told Plaintiff that he would see to it that the hours were paid.

32. On or about March of 2003, EXPO President Elaine Vercheran, Senior Manager of National Marketing and Advertising Jerry Carbone, and Director of Employment Practices and Associate Relations Emory Cooper visited the store. Several other company executives and managers accompanied her. Vercheran and Carbone commended Plaintiff on his advertising work, and Carbone made particular point of the Story Boards Plaintiff had developed. He stated that he would like to expand the concept nationally, and instructed Plaintiff to take several of the displays for copies at a local copy center. (On follow-up, Carbone told Plaintiff that he had received the information and was in the process of taking the concept national.) Plaintiff filed an expense report (with a receipt) for the copies. It was never paid. During the same walk, Carbone commented about the Video Portfolio Plaintiff had developed for EXPO. "Some EXPOs have made video tapes or CDs, not one person has done it to this detail!"

33. Carbone then stated, "And I understand that you still haven't been paid for any of this work." So as not to interfere with the walk, Plaintiff and Carbone decided that they would address the matter at a later time. That promise was never kept.

34. Also around this timeframe, the Design Department Head position opened. Plaintiff applied for the position, and Human Resources notified Plaintiff that he would be called in to interview. Although, Plaintiff was "promotable", and had extensive kitchen and bath design experience, supervisory experience, and an engineering degree, he was once again passed over by Talbot. Talbot offered no explanation for not interviewing Plaintiff.

The position was given to one of Talbot's best friends, Olga Sahan, who had 6.9 percent mark-downs on her projects at the time of the promotion.

35. In April of 2003, Plaintiff met with the Director of Employment Practices and Associate Relations, Emory Cooper. Cooper asked Plaintiff about Talbot and her treatment of himself and others, as relayed that he was in the store because he had received complaints. Plaintiff discussed being removed from Department Supervisor Training by Talbot for reporting permit violations. Plaintiff also reported that Talbot regularly instructed designers to collect more money than the actual project's product balance, so that more materials could easily be ordered if need be during installation. She was quite clear that the customer was not to made aware of this padding. On several occasions, additional product was ordered without the customer's knowledge or approval with these funds. Plaintiff felt that Talbot had also held the photo pay as retaliation for reporting permit issues. Plaintiff provided Cooper with a detailed spread sheet of all hours worked "off the clock" (per instruction and with the promise of pay). Cooper promised to get back with Plaintiff in two weeks. (Even after separation, Cooper maintained that he had given the instruction that the hours be paid, and asked Plaintiff for another copy of the hours after Plaintiff's termination. He stated that he would pay Plaintiff "as a photographer". Plaintiff provided the hours to management several times, including Cooper and District Human Resources Manager Noel Alvarez. The pay has never come.)

36. In July of 2003, Store Manager Tony Verterami had also called Plaintiff in at the Burlington location to commend Plaintiff for extremely high sales and work on customer issues, and told Plaintiff that he reported this to District Manager George Kay. Plaintiff talked to Verterami at that time about Talbot removing him from Department Supervisor Training he had been scheduled to attend. This was done in retaliation for reporting violations. Verterami informed Plaintiff that he would personally see to it that Plaintiff was in the next class. (Shortly thereafter, Verterami quit and went to wk for Lowes. Verterami had a private talk with Plaintiff prior to his departure in which he confided that "about a dozen stores" were going to close.)

37. Talbot began showing favoritism to a select few. Even trips went to her circle of friends. Although Plaintiff had amassed several merit badge awards, customer letters, favorable surveys, and was doing extra work on customer issues, photo work, and Home Shows (co-captaining two), and had record sales, he never received any type of recognition or award from Talbot. All recognition was from Store Management or higher.

38. Also In July of 2003, Plaintiff became aware of work on an EXPO project which the installer, J&J Contracting, was doing under private contract and without EXPO approval. The work should have been done under an EXPO contract, but was deliberately withheld from EXPO. Plaintiff had been informed of the private contract by the customer. J&J Contracting had developed a system where they would order materials (in this case chair rail) directly from the manufacturer (an EXPO vendor), and install the materials without EXPO's knowledge to increase J & J Contracting's revenues. EXPO was disparaged by being denied sales and profits to which they were rightfully entitled. When Plaintiff reported the matter to Talbot, he was told to let go of the matter. This is when Plaintiff began to suspect that J&J was receiving some assistance from someone at EXPO in ordering the materials, as the vendor generally would not do business directly with the general contractor. The violation lay in how the materials were paid for, and the fact that there was no Change Order amending the installation contract as required.

39. On July 30, 2003, Plaintiff contacted Cooper's office and left a voicemail message regarding lack of payment for the photo hours, and that he was still waiting for Cooper's reply (which had been promised within two weeks back in April).

40. In August 2003, Plaintiff won a sales contest which had been outlined in a memo from manager Tracy Talbot. (The memo had been issued on August 1, 2003) Although the fact that Plaintiff won the contest has never been in dispute, the award of $250 was never paid. Talbot simply would not release the award money. Alternatively, a designer (Cynthia Gatto) won the contest the following week and was paid her award money. Plaintiff filed several complaints, up to the level of the EXPO Director of Employment Practices and Associate Relations, Emory Cooper, and provided Cooper with a copy of the memo.

41. On August 6, 2003, Plaintiff left another voicemail message for Cooper regarding photo pay.

42. On August 13, 2003, Plaintiff called Cooper's office once again and talked to his assistant, Roger Nelms. Nelms indicated that he would pass the message concerning photo pay to Cooper.

43. Also in August, 2003, Plaintiff was commended in a store meeting by Verterami for generating in excess of $71,000 in sales for the week. Plaintiff was in a friendly challenge with Verterami that he could generate ten percent of the store's plan for the week ($710,000). Plaintiff had accomplished the goal.

44. Plaintiff was asked to prepare engineering drawings on various projects for EXPO, and utilize his engineering and kitchen design backgrounds to assist various designers on customer projects.

45. In October of 2003, Plaintiff became aware of severe violations of company policy committed by Design Department Supervisor Olga Sahan and J&J Contracting on a project at 3 Harris Dr, Southborough, Massachusetts. Plaintiff was the Project Superintendent overseeing a major kitchen renovation at the home of Katherine and Chris Faherty. Plaintiff discovered that the contractor and Ms. Sahan were bypassing EXPO protocol and ordering materials directly from the manufacturer (an EXPO vendor), in an attempt to directly charge the customer and increase their revenues and profits, depriving EXPO of the same. After learning on site that additional materials had been ordered, Plaintiff immediately returned to EXPO to look for the order in the Special Services Ordering System and the PATS project tracking system. None could be found. According to company policy, any and all changes to the project were to go through the Project Superintendent with an appropriate Change Order filed. The project designer was also unaware that the materials had been ordered. Plaintiff approached Sahan about the situation, and was told to keep out of it. Plaintiff then went to Talbot, who told Plaintiff that he was to disregard the order.

46. Plaintiff talked to Human Resources Manager James Dillon about the matter. Dillon had no response.

47. In November of 2003, Plaintiff once again brought the matter to Dillon's attention.

48. Throughout the first quarter of 2004, the matter became quite serious. The customer began complaining about the clandestine activities between Sahan and J&J Contracting. Plaintiff continued to bring the matter before Dillon and Store Manager Bing Yeo. At one point when Plaintiff was reporting the issue to Dillon, Dillon exclaimed, Well, what do you want ME to do about it!?" Dillon was the store's Human Resources Manager, and by the "open door policy", Plaintiff was bringing the issue to Dillon and Store Manager Yeo.

49. Plaintiff filed several complaints with Defendant's management, Human Resources Department, and confidential Awareness Line regarding unethical activities, being forced to work "off the clock" regarding the photo work, retaliatory action, unfair treatment, and several threats he had received from Talbot and Sahan about his review. The Awareness Line number was posted in the store on a poster and promised anonymity and protection against retaliation. It was also widely displayed in the form of a pamphlet entitled "Make a Difference!"

50. Plaintiff's Human Resources Manager, James Dillon called Plaintiff in to his office the following morning and told Plaintiff that he was aware of the call. Dillon instructed Plaintiff to call the hotline back and report "no issue".

51. On April 3, 2004, District Human Resources Manager Noel Alvarez contacted Plaintiff by voicemail regarding his call to the Awareness Line. Alvarez talked to Plaintiff at length a few evenings later regarding the permit issue, retaliation by Tracy Talbot & Olga Sahan, the refusal of Dillon and Yeo to address the issue, Dillon's instruction to call the Awareness Line back and report "no issue", and the lack of pay for the photo work.

52. Plaintiff called the Awareness Line number back and talked with them about their promise of anonymity and protection from retaliation. He was later contacted by a supervisor with an apology.

53. In April of 2004, Plaintiff received a retaliatory review from Sahan and Talbot for reporting violations. Although Plaintiff reported suspected retaliation to the Awareness Line well before the review, the only result was a further threat from Mr. Dillon for calling the Awareness Line. Ms. Sahan and Tracy Talbot were irate about the reporting, and let Plaintiff know that he would be punished for reporting their unethical behavior.

54. During the April and May timeframe, Dillon called Plaintiff into his office and accused Plaintiff of fabricating the issue. Dillon stated, "Olga would never do anything like that." and, "It's simply not in Olga's character." Yeo called Plaintiff in, and with Dillon denied Plaintiff's claims without investigating the matter.

55. During this time frame, Plaintiff also reported problems with a project at 76 Crest St, Concord, MA. The customer's name was Leslie Sederlund. The contractor was again J & J Contracting, who claimed to have permits, but would not display them prominently as required by Massachusetts State Law. It was soon determined that J & J Contracting was not licensed in Massachusetts. According to customer Faherty, Gus Romano had been issued a cease and desist letter from the principal of J & J Contracting, as Ramano had broken ties with the principal, but continued to operate as J & J Contracting.

56. Plaintiff also discovered that J & J had convinced the customer (Sederlund) to return several thousand dollars in EXPO flooring and cancel the installation, only to have J & J repurchase the flooring and install it under private contract. Not only was the contractor directly competing with EXPO in violation of his contract, but had actually caused a return of Special Order product at great expense to the company. This was in violation of EXPO policy. Plaintiff reported this to Talbot, who then instructed him to allow the unlicensed, uninsured contractor (J&J Contracting) to work on the Sederlund site in Concord, MA "because she [Leslie Sederlund] likes him". This is not only a violation of SOP, but of Massachusetts General Law. Talbot was also aware at the time that proper permits had not been pulled on the site, another violation of SOP and the law, and that the customer had been falsely charged for such permits. Tracy told Plaintiff to "keep out of it!"

57. On May 5, 2004, Plaintiff was asked to prepare a statement for Dillon. Plaintiff prepared the statement, outlining among other things:
    a. The material ordered by J & J Contracting through Olga Sahan, bypassing the Project Superintendent (Plaintiff) and EXPO in violation of EXPO policy and the contractual relationship between J & J Contracting and EXPO
    b. Threats made by Gus Romano of J & J Contracting toward Katherine and Chris Faherty
    c. Customer complaints directed at Olga Sahan and J & J Contracting
    d. A lien letter and threat of lawsuit which the customer stated that they had received from Gus Romano of J & J Contracting
    e. Fear of reprisal for Plaintiff's reporting

58. In May 2004, Dillon called Plaintiff into his office. Dillon had a letter that the customer had written to Home Depot CEO Robert Nardelli, expressing their displeasure with Olga Sahan and J & J Contracting (Gus Romano), and stating that Plaintiff was the only one who was acting in their best interests. Dillon then accused Plaintiff of knowing the customers (Faherty's) prior to the projects start and being old friends. This was not true, as customers were assigned to Project Superintendents by management, with Project Superintendents having no say in the matter. Plaintiff had met the customer the same day as Dillon, at the Discovery Meeting. (Plaintiff had been selected to take Dillon, who was a new manager in training at the time, to the meeting, as Plaintiff's was known for conducting thorough meetings according to SOP.)

59. On June 2, 2004, Dillon, Yeo, and District Human Resources Manager Noel Alvarez called Plaintiff (who was on his way to site) and asked him to report to Yeo's office. In the short meeting, Dillon and Yeo again accused Plaintiff of making up the story. Plaintiff asked to speak with Alvarez alone (to discuss the treatment by Dillon and Yeo and provide concrete evidence of the permit claims). Alvarez assured Plaintiff that after he made a few calls that he had to make, he and Plaintiff would talk. Apparently, Alvarez left. At about 3:15 PM, Plaintiff was called into Yeo's office and placed on unpaid Administrative leave for "filing false charges", stating that Plaintiff would be brought back to work and paid for the leave or terminated pending an investigation to be completed within two days. Plaintiff was apprised that no one would disclose to associates that Plaintiff had been placed on administrative leave. Although the leave lasted weeks, not days, Defendant failed to provide Plaintiff with an unemployment compensation pamphlet notifying Plaintiff that he was eligible for benefits as prescribed by Massachusetts Employment and Training Law.

60. Upon being placed on unpaid leave, Plaintiff immediately called Atlanta and filed a complaint with EXPO Director of Employment Practices and Associate Relations, Emory Cooper. An investigation by that office concluded that Plaintiff's complaints were valid, and Plaintiff was exonerated of the claim of bringing false charges. Plaintiff was brought back to work on June 22, 2004, but reassigned to a location further from his home to avoid further retaliation. Plaintiff was not paid for the leave as had been promised.

61. Plaintiff was asked to prepare written statements for Cooper, which he did in the form of two letters; one dated June 4, 2004, and the other dated June 25, 2004.

62. Plaintiff reported the following violations to Cooper during the investigation by his office:

    6/4/04 – Sederlund job-I have been informed that no electrical or building permits were ever pulled for this site, and although a plumbing permit was pulled, no inspections were ever done. (Rough and finish plumbing have been completed.) This can be verified by calling the Concord, MA Building Inspector at 978-318-3280.

    Personal investigation has also revealed that no building permits were pulled at the Marous site, 7 Birchwood, Southborough, MA; or at the Faherty site, 3 Harris, Southborough, MA. No electrical permit was pulled at the Faherty site as well. The inspector can be reached at 508-485-0710 X3022.

63. Plaintiff also discussed the photo pay issue with Cooper during the leave. Cooper stated, "I authorized that. I told them to pay it a year ago." When Plaintiff told Cooper that Burlington management's replies (Jim Dillon and Tony Verterami) had been that he had never answered any of their calls, Cooper said, "Mark, do you know how often we talk?"

64. On June 23, 2004, due to the reassignment, Plaintiff was instructed to contact Burlington EXPO Store Manager Bing Yeo, and review all projects Plaintiff had overseen at that store. During this discussion, Plaintiff asked Yeo what he had determined during his investigation while Plaintiff was on suspension. His reply was, "They verified the things you were saying." Plaintiff asked Yeo how he felt about suspending Plaintiff for "filing false charges" before conducting an investigation. Yeo's reply was, "It's all in my report."

65. On June 23, 2004, after returning Project books to the Burlington EXPO, Plaintiff met with District Manager of Human Resources Noel Alvarez. Alvarez informed Plaintiff, "If I have to put more people on suspension, I will." Although all of Plaintiff's claims had been verified, no one else was suspended. This allowed Sahan, Talbot, Dillon, and Yeo to continue making extremely disparaging remarks and false statements regarding Plaintiff. This was not only prejudicial toward Plaintiff, but allowed for collusion by those he had reported.

66. Alvarez instructed Plaintiff to prepare a report of additional information regarding permit violations and money collected in excess of the balance due from the customer. Plaintiff supplied this information in the form of a letter to Alvarez on June 25, 2004. Plaintiff also informed Alvarez that he had been contacted by an associate and informed that Olga Sahan had disclosed that he had been placed on Administrative Leave, in violation of the

assurance Plaintiff had been given, in violation of company policy, and a major work rule violation. Plaintiff provided evidence supporting his statement.

67. Despite the reassignment, retaliation from management at the previous location continued. Plaintiff became aware of a campaign by Burlington Store Manager Yeo, Store HR Director Dillon, Talbot, and Sahan to badmouth and diminish Plaintiff's reputation. They had solicited letters from close friends of Tracy and a contractor in her favor. (Dillon, Talbot, and Sahan were later terminated, and Yeo was asked to tender his resignation. He complied.)

68. A short time after Plaintiff returned to work, Dillon was terminated. Alvarez later told Plaintiff that Dillon was partially terminated for information Plaintiff had provided.

69. On July 8, 2004, Plaintiff was approached by the Regional Installation Manager, Joseph Hunsberger, who stated that he was aware of the confidential report to the Director of Employment Practices and Associate Relations regarding ethics violations and permit violations. Hunsberger then demanded a copy of the report. Plaintiff stated that he was under strict instruction to never release a copy of the report, and that only the Director of Human Resources and Employee Relations Cooper and District Human Resources Manager Alvarez would have copies of the report. Plaintiff then stated that he would contact Alvarez on behalf of the Regional Installation Manager and let him know of the request.

70. On July15, 2004, Hunsberger was at the Braintree location. He became enraged and started screaming at Plaintiff. Hunsberger was outraged that Plaintiff had not given him the report, and Plaintiff only stated that he was forbidden to release the report without express permission, and that two calls to Alvarez had gone unanswered. Hunsberger then began to attack Plaintiff for the shirt he was wearing, stating that the flower pattern on the collared shirt was "appropriate for the beach, but not for here!" Plaintiff's shirt was new, collared, and fit the company's dress code requirements. Hunsberger then paraded Plaintiff through the store, humiliating and disparaging Plaintiff, and instructed another employee (wearing clothes which were not within Dress Code guidelines) to call the Store Manager because he was sending Plaintiff home. The store manager was not in that day. Plaintiff filed complaints that day regarding harassment, abusive language, and retaliation against Hunsberger. These complaints were filed successively with Plaintiff's manager (Robert Sylvestri) and the store Human Resources Manager (Garret Bandison). The following day, Plaintiff filed the same complaint with the Store Manager (Pat Kryzak).

71. On 27 July, Plaintiff was recognized by Store Manager Kryzak and District Manager George Kay for outstanding performance for increasing the stores incoming design business (retainer) rate by 400% by his own initiatives.

72. In September, 2004, Plaintiff was promoted two levels, from associate to Central Installation Manager (CIM). Plaintiff's position as Project Superintendent was being eliminated and was being replaced with the CIM position. Plaintiff was one of eight people assigned to the new position, for which 70 had interviewed according to Hunsberger.

73. Hunsberger called Plaintiff in September and instructed Plaintiff to leave immediately for a drug test as a condition for promotion. Plaintiff complied. Hunsberger also accused Plaintiff of making false accusations of permit violations in June and said he wanted no more reporting, although the June investigations had all confirmed Plaintiff's claims.

74. In October, 2004 Plaintiff was called in by Braintree Store Manager Pat Kryzac and told she had contacted District Manager George Kay and District Personnel Manager Noel Alvarez. She told Plaintiff that she placed the calls to tell them of meritorious service on his part, stating that she was extremely happy with all the extra work he had been doing directly for her, including a project which increased the incoming project retainer business (new design project customers) by a factor of four.

75. In Plaintiff's capacity as a Central Installation Manager, he was reassigned the Faherty job at 3 Harris Dr, Southborough, Massachusetts, along with a new contractor. J & J Contracting had been dismissed by this time. The customer stated an attempt had been made by Bing Yeo to give them Home Depot's Home Improvement Contractor (HIC) number to cover J&J Contracting's work. The customer was aware that the number did not apply because J & J Contracting was not employed by Home Depot or EXPO, but an independent contractor.

76. Plaintiff's new manager, EXPO Services Manager Paul Owen stated that Owen's boss (the Regional Installation Manager Hunsberger) had talked to him and expressed his outrage toward Plaintiff. The relationship between Plaintiff and Owen had been good, but immediately changed, and thereafter Plaintiff was treated harshly and disparagingly by Owen. Owen was clear that he was aware of the violations Plaintiff had reported.

77. On October 7, 2004, Owen told Plaintiff, "I have to go out and interview." Plaintiff asked. "Interview?" Owen's reply was, "Yeah. For those of you who are going to wash out."

78. On October 29, 2004, Owen approached Plaintiff and said, "People are keeping score."

79. On November 4, 2004, Hunsberger met with all Central Installation Managers in the New Jersey Regional Support Center. He made two notable points:

   a. You must have permits – If you START w/o them, you will be written up, demoted, fired."
   b. He will not tolerate those who witness a violation of SOP and do not report it. That person will be disciplined more than the person who committed the violation."

80. Central Installation Managers were ask to prepare memos to Owens concerning problem jobs on November 11, 2004. Plaintiff cited two:
   a. Faherty permits issue, contractor was not licensed. He noted calls to the city of Southborough Building Inspector to verify the information
   b. Taylor design issues. SOP violations by the designer. Customer complaints regarding the designer.

81. On November 11, 2004, Plaintiff met with Owen to go over problem jobs outlined in the memo. Plaintiff was then informed by Owen of a "set-up" and that the Regional

Installation Manager Hunsberger planned to terminate him. Several comments were made by Owen which Plaintiff noted:

a. "You know, you weren't Joe's (Hunsberger) favorite person in that mtg."
b. "Have you ever considered that they are baiting you?"
c. "I can just tell you that others are watching."
d. "Keep in mind that they might just be setting you up."
e. "They may be baiting you."

He went on to explain to Plaintiff that there were a lot of hard feelings about the permit reporting, and that Plaintiff would probably still pay the price for it.

Owen asked Plaintiff to prepare email a memo on the Taylor issues for a meeting with new Braintree Store Manager Joe Martins, who had just transferred from Burlington. Owen stated that he would meet with Martins on November 12.

82. On November 22, 2004, Owen held a staff meeting with the CIM's in which he threatened a policy of MAD (Mutually Assured Destruction), stating "If I get fired, I'm taking other people with me!"

83. On December 3, 2004, Plaintiff called Owen and reported that customer Taylor had lodged several complaints about designer Christine Maggio, and had asked that the designer not be allowed in her home anymore. These problems had been outlined in the November 11 memo to Owen from Plaintiff.

84. On December 7, designer Maggio showed up at customer Taylor's home after clear instruction that she was not to go to the home. This infuriated the customer, who lodged a complaint with Plaintiff regarding Maggio. Taylor reiterated that she did not want Maggio in her home.

85. Plaintiff met that day with Store Manager Joe Martins, Maggio, and Design Supervisor Jill Diamondis. Martins was enraged that he had not been informed of any problems on the Taylor job. (Plaintiff had always worked well with Martins in Burlington, and had no issue with him.) Plaintiff told Martins that he had been told that all of the items had been outlined by Owens in their November 12 meeting. Martins stated that the meeting never took place, and that this was his first exposure to the issues. Martins was so angry that at one point he leaned across the desk he was behind and put his finger in Plaintiff's face in a threatening manner. He was quite loud and agitated. (Martins admitted to this during a later investigation into the meeting.) He wanted to meet with Owen the following day to go over the issues and the customer's complaint against Maggio, and agreed that Plaintiff could be present. Plaintiff reiterated that Owen had told him he was reviewing all of the Taylor job issues in a November 12 meeting, that Plaintiff had even been asked to prepare a memo for the meeting, and that Plaintiff was unaware the meeting never took place. Martins asked Plaintiff to retrieve Special Order information to verify some of the major issues, and Plaintiff retrieved the information for the meeting with Owen, Martins, and Plaintiff.

86. Later that evening, Hunsberger conducted a General Staff Meeting with Designers and CIMs, and later with CIMs alone. He informed the CIMs that he was headed out to fire a contractor which Plaintiff and others had reported as being a no-show on job sites.

87. Hunsberger then met with Plaintiff and Owens alone, and instructed Plaintiff that he was being placed on paid Administrative Leave. He instructed Plaintiff to leave immediately. Plaintiff complied.

88. On his way home that evening, Hunsberger contacted Plaintiff and stated that he had acted in the "now mode". He told Plaintiff that he was not being charged with anything. Hunsberger informed Plaintiff that he was on his way to terminate contractor Owen's Corning and that he had been worked up.

89. Plaintiff contacted Director of Employment Practices and Associate Relations Emory Cooper the following morning and reported that he had been placed on paid leave with no explanation given.

90. Owen called Plaintiff the next morning and claimed that he had no idea what was going on.

91. Hunsberger talked with Plaintiff and reiterated that Plaintiff was not being charged with anything.

92. Hunsberger contacted Plaintiff on December 17, 2004, and said that everything was fine. He stated that he just wanted Paul Owen and Plaintiff to talk.

93. Plaintiff met with Owen on Saturday, December 18, 2004. Store Human Resources Manager Garrit Bandeson entered the room. Owen informed Plaintiff that he was fired. They would not give a reason. Plaintiff was not given his final check with accrued benefits.

94. Plaintiff immediately reported the termination to Cooper. Plaintiff was later told by Cooper that the reason given for the termination was for "violation of the respect policy", with no supporting information given.

95. Despite Defendant's system of progressive discipline, none was afforded to Plaintiff. Plaintiff was not on any disciplinary action at the time of his discharge.

96. On December 20, 2004 Plaintiff and Cooper discussed the termination. Plaintiff inquired about pay for the June leave after Plaintiff had been exonerated. Cooper's response was, "I believe you were supposed to be paid for that." Regarding Plaintiff's promotion to Central Installation Manager, Cooper stated, "Mark, I was personally involved in that decision and I can tell you that you got that job entirely on your own merits."

97. Plaintiff filed for unemployment compensation, and received a Benefit Determination Form with information which was falsified by Defendant. The notice contained several falsehoods:

   a. Zero income for the second quarter of 2004, when Plaintiff was gainfully employed.
   b. Total wages were underreported by almost 29%.
   c. The separation date was listed as December 7, 2004. The actual separation date was December 18, 2004.
   d. Item 12, Separation code, was reported as C (Convicted). Plaintiff was neither charged nor convicted of a crime.

Plaintiff contacted the Commonwealth and was told that the separation code could only be corrected by the employer.

98. Plaintiff filed a letter with the Commonwealth of February 10, 2004, after Cooper's office failed to have the false information given to the Commonwealth corrected. Plaintiff had complained to Cooper several times, both telephonically and in writing regarding the false information.

99. Plaintiff filed a letter with the Commonwealth on February 17, 2004, after Defendant also failed to provide three of Plaintiff's last four paychecks, which greatly delayed Plaintiff applying for unemployment and medical reimbursement benefits. The medical reimbursement program became so ensnarled due to Defendant's delays that eventually the statute for reimbursement expired, greatly diminishing Plaintiff.

100. Plaintiff had several discussions with Cooper regarding the pay for photography work. In a prior discussion, Alvarez had requested the spreadsheet with the hours once again from Plaintiff, as the decision had been made to pay Plaintiff "as a photographer" according to both Cooper and Alvarez. Plaintiff informed Cooper that he had given the hours to Alvarez, which was acceptable to Cooper.

101. Over the next eight months, Defendant claimed that they were investigating the discharge on grounds that it was retaliatory, and instructed Plaintiff to write numerous reports on the permit, over-charging, retaliation, photo pay, and award pay issues. Defendant had numerous phone discussions with Plaintiff regarding these issues, on the premise that when the issues were cleared up, Plaintiff would be brought back to work and compensated for his time spent on the matters.

102. This culminated in a March 22 private meeting in Boston at the Hampton Inn and Suites Hotel. Plaintiff was to meet with Cooper privately from 9 AM to 2 PM to go over the issues, presenting his case. No one was to know of the meeting, although Plaintiff was informed before the meeting that Owen was openly talking about it. Cooper seemed surprised at Owen's knowledge of the meeting.

Plaintiff arrived at the meeting, and was greeted by Cooper. Before the meeting began, Cooper informed Plaintiff that there would be another party. Plaintiff inquired as to whether any lawyers would be present, as he would not have continued. Cooper answered, "No." Plaintiff and Cooper were accompanied by a New York Manager of Loss Prevention, who proceeded to interrogate Plaintiff concerning any permit issues. Shortly into the meeting, Cooper informed Plaintiff that Tracy Talbot and Olga Sahan had been terminated. He was told that the issues he had raised had been confirmed. Cooper asked Plaintiff, "Mark, is there anything that would prevent you from returning to Burlington?" Plaintiff's response was, "Well, now that Tracy, Olga, and Dillon are gone, I would only say Bing Yeo." Cooper's response was, "Mark, we accepted his resignation this morning."

Plaintiff raised the issue of the false information which had been provided to the Commonwealth of Massachusetts Division of unemployment. Cooper told Plaintiff that an independent outfit handled the matter. He stated, "That will only take a day to fix."

However, the Commonwealth of Massachusetts was never notified, even after repeated requests to Defendant by the Plaintiff.

The meeting continued, with much of the time and questioning being conducted by the Loss Prevention Manager. There was no real case presentation. Cooper acknowledged the actions that had resulted in the terminations of those whom Plaintiff had reported, and openly discussed Plaintiff's return to work at Plaintiff's original work location. The meeting ended with the Loss Prevention Manager asking if there were any other violations that Plaintiff knew of. Cooper added, "None where the Statute of Limitations has expired."

103. Shortly after the meeting, an press release was put out by Home Depot stating that several EXPO stores were closing, including Braintree. This answered the question of why Cooper was talking to Plaintiff about returning to Burlington.

104. Discussions continued over the next several months, amounting to countless hours of phone calls and several emails with attached reports. Cooper's office would set phone meetings, and Plaintiff would comply to his detriment. Cooper then agreed to a second meeting in Boston. Shortly before finalizing this meeting, in August, 2004, Cooper informed Plaintiff that they had enough information and that he had decided not to bring Plaintiff back. Cooper stated, "If you don't like that decision Mark, I suggest that you sue us."

105. Plaintiff maintains that throughout his employment he relied on Home Depot's Open Door Policy, which is not only expressed in the Associate Handbook, but is aggressively touted, widely distributed, and prominently displayed throughout the store in form HDC-286, a pamphlet titled "Your Career at The Home Depot", which outlines the policy. The Open Door Policy states:

> Through our Open Door Policy, we are committed to providing a positive environment of two-way, open, honest and respectful communication for all Home Depot associates, without fear of retaliation.
>
> Associates are encouraged to voice any concerns, problems, observations or suggestions on any subject. The supervisor's door is always open to resolve workplace issues quickly and fairly.
>
> Even with open communications, your immediate supervisor may not be able to solve all your concerns or problems. If your department supervisor or assistant manager cannot help you, the problem should be taken next to the Store Manager, District Manager, Regional Vice President or to the Division President.
>
> Keep in mind that the Human Resources Manager cares about your problems, concerns or issues and is available to help you with them.
>
> For more information about the Open Door Policy, refer to the Associate Handbook or contact your Store Manager.

This pamphlet also contains Home Depot's Ethics Wheel, explaining each category. Two are directly relevant to Plaintiff's case:

### Doing the Right Thing

We exercise good judgment by "doing the right thing" instead of just "doing things right." We strive to understand the impact of our decisions, and we accept responsibility for our actions.

### Taking Care of Our People

The key to our success is treating people well. We treat our people well by encouraging associates to speak up and take risks, by recognizing and rewarding good performance and by leading and developing people so they may grow.

106. Plaintiff also relied on Defendant's aggressively stated policy regarding reporting violations of company policy or illegal activity. This is outlined Defendant's form HDS-4017, entitled "Make a Difference!" The pamphlet states:

If you become aware of conduct that may be illegal, in violation of company policy or simply contrary to our values, speak up and report what you know to your management team at the location where you work.

### If you are not sure, ask yourself these questions:

1. Is it illegal, unethical, or contrary to company policy?
2. Could it do harm to you, you fellow associates, your customers, your location, or the Company?
3. Is someone trying to keep this a secret?

The pamphlet further states:

### A Reporting Alternative

If you do not feel that you can talk to anyone on your management team or if you want to remain anonymous, then there is another option. You can report issues to the Home Depot Awareness Line by calling 800.286.4909 (or call collect from China or Mexico at 770.613.6311).

The pamphlet further states:

**Theft, fraud, and other dishonest acts hurt everyone. The losses caused by dishonesty mean higher prices for our customers and reduced shareholder value. The Home Depot is committed to**

**maintaining a culture that reinforces integrity as an important component of our success. By reporting an act of theft or fraud committed by another associate, you may be eligible for a cash award of $100 up $1000. You have the option to remain anonymous.**

Defendant has created an actual inducement to report violations of the nature which Plaintiff reported by offering a cash reward for reporting another associate's fraudulent activities.

### First Claim for relief
### Breach of contract

For a first claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 106, inclusive of this complaint, and further states and alleges as follows:

107. Through the promulgation of its personnel policies and procedures, Associate Handbook, and pamphlets, Ethics posters, training classes, and Open Door Policy Defendant made a clear, definite promise that it would not retaliate against employees for using its internal complaint procedure.

108. Defendant reasonably should have expected the plaintiff to rely on the promise as his basis of conduct.

109. Through the promulgation of its personnel policies and procedures as outlined in the Associate Handbook, Open Door Policy, pamphlets, posters, and training classes, Defendant manifested its willingness to enter into a bargain in such a way as to justify Plaintiff in understanding that his assent to the bargain was invited by Defendant, and that his assent would conclude the bargain. Plaintiff accepted such policies and procedures, relying upon them by means that included but were not limited to continued employment with Defendant. As a result thereof, Defendant became contractually bound to comply with the said personnel policies and procedures.

110. In addition or in the alternative, Defendant reasonably should have expected Plaintiff to consider such personnel policies and other assurances made by it and its management employees as Defendant's commitment to follow the said personnel policies and procedures. Plaintiff reasonably relied on such procedures to his detriment by means that included but were not limited to his continued employment with Defendant. Injustice can be avoided only by enforcing such policies and procedures.

111. Defendant breached its own policies and procedures by terminating Plaintiff's employment in the manner that it did. Such breach included, but was not limited to, its failure to give Plaintiff any prior warnings, counseling, or progressive discipline prior to its decision to terminate his employment allegedly for violating the respect policy.

112. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and will suffer a diminution of his wages and benefits; has suffered other economic losses resulting from his loss of employment and loss of wages and

benefits; has suffered and continues to suffer from severe emotional distress; and otherwise has suffered and continues to suffer and will continue to suffer damages and losses in an amount to be determined at trial.

## Second Claim for relief
## Wrongful Discharge

For a second claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 112, inclusive of this complaint, and further states and alleges as follows:

113. Plaintiff had both a legal right and a basic responsibility as a citizen and employee to provide information to Defendant and local Municipal governments regarding fraudulent and other improper practices by Defendant's other employees and contractors. Plaintiff's disclosures, as described in this complaint, were pursuant to his legal right and basic responsibilities as a citizen and as an employee to report such information.

114. Defendant, through its duly authorized management employees, expressly or impliedly forbade Plaintiff from disclosing information to its Awareness Hotline, Executive Management, and local municipal governments that Plaintiff had a right and/or duty to disclose. Such prohibition undermined a clearly expressed policy relating to Plaintiff's basic responsibility as a citizen and/or his rights or privileges as a worker. Defendant, through its duly authorized management employees, terminated Plaintiff's employment as the result of his refusal to adhere to the illegal prohibition imposed on him and in retaliation for his having engaged in this protected activity. Defendant was aware, or should have been aware, that Plaintiff's refusal to adhere to such illegal prohibition was based on his reasonable belief that such prohibition was contrary to a clearly expressed public policy relating to his duties as a citizen and/or was a violation of his legal rights or privileges as a worker.

115. In addition or in the alternative, Defendant, through its duly authorized management employees, terminated Plaintiff's employment in retaliation for his having disclosed information of what he reasonably assumed to have been improper and/or illegal activities by other than Defendant's employees. Such termination violated public policy, in that it created a strong chilling effect against the disclosure of information by Defendant's employees to its Awareness Hotline, Executive Management and/or to local municipal governments concerning what was reasonably believed to be illegal and/or improper conduct.

116. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and will suffer a diminution of his wages and benefits; has suffered other economic losses resulting from his loss of employment and loss of wages and benefits; has suffered and continues to suffer from severe emotional distress; and otherwise has suffered and continues to suffer and will continue to suffer damages and losses in an amount to be determined at trial.

117. Plaintiff's injuries were attended by circumstances of fraud, malice, or willful and wanton conduct. An award of punitive or exemplary damages is necessary, both to

punish Defendant for its misconduct and to set an example for other persons who might be tempted to engage in similar misconduct.

### Third Claim for relief
### Promissory Estoppel

For a third claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 117, inclusive of this complaint, and further states and alleges as follows:

118. Through the promulgation of its personnel policies and procedures, Associate Handbook, and pamphlets, Ethics posters, training classes, and Open Door Policy Defendant made a clear, definite promise that it would not retaliate against employees for using its internal complaint procedure. By making such profound statement, and widely disseminating it through so many mediums, Defendant reasonably should have expected the plaintiff to rely on the promise as his basis of conduct, and expect action or forbearance on the part of the employee as a result of the statement. The overall tone of the Open Door Policy and the promise of protection from retaliatory action indicate Defendant's intention to create a working environment in which its employees can expect to be treated fairly with regard in the pursuit of grievances and reporting of unethical or illegal activity.

119. Plaintiff relied on Defendant's promise of protection in taking action and reporting unethical and illegal activity, and justice can only be avoided by enforcement of the promise. By terminating Plaintiff for such reporting, Defendant breached that promise.

120. As a direct and proximate result of the foregoing, Plaintiff has lost wages and benefits; continues to suffer and will suffer a diminution of his wages and benefits; has suffered other economic losses resulting from his loss of employment and loss of wages and benefits; has suffered and continues to suffer from severe emotional distress; and otherwise has suffered and continues to suffer and will continue to suffer damages and losses in an amount to be determined at trial.

### Fourth Claim for relief [1]
### Fair Labor Standards Act

For a fourth claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 120, inclusive of this complaint, and further states and alleges as follows:

---

[1] Plaintiff acknowledges that the Court has dismissed count 4 - Fair Labor Standards Act, except with respect to any failure to pay wages accrued on or after December 18, 2008.

121. Defendant violated 29 U.S.C. § 206(a) by failing to pay Plaintiff the applicable minimum wage for every compensable hour of labor he performed.

122. The violations of the FLSA set out above resulted from the Defendants' failure to reimburse Plaintiff for time worked under the instruction of Defendant with the promise of pay, and primarily for the benefit of Defendant.

123. Defendant's failure to pay Plaintiff the federally mandated minimum wage was a willful violation of the FLSA within the meaning of 29 U.S.C. § 255(a), as Defendant stated a clear intent to pay on several occasions.

124. As a consequence of the Defendant's violations of the FLSA, Plaintiff is entitled to recover his unpaid minimum and overtime wages, plus an additional equal amount in liquidated damages, costs of suit, and reasonable attorneys' fees pursuant to 29 U.S.C. § 216(b).

## Fifth Claim for relief [2]
## Massachusetts Wage Act

For a fifth claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 124, inclusive of this complaint, and further states and alleges as follows:

125. Defendant violated G.L. c. 149 § 148 and G.L. c. 151 § 1A by failing to pay Plaintiff the applicable minimum wage for every compensable hour of labor he performed.

126. The violations of the Wage Act set out above resulted from the Defendants' failure to reimburse Plaintiff for time worked under the instruction of Defendant with the promise of pay, and primarily for the benefit of Defendant.

127. As a consequence of the Defendant's violations of the Wage Act, Plaintiff is entitled to recover under the provisions of G.L. c. 151 § 1B

## Sixth Claim for relief
## Quantum Meruit

For a sixth claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 127, inclusive of this complaint, and further states and alleges as follows:

128. Plaintiff's first application of Quantum Meruit is based on Defendant's instruction to Plaintiff to perform work outside of the course of his normal business, and further instruction to turn in the hours for payment. Defendant made several promises to pay, confirming their knowledge and consent. It is reasonable for Plaintiff to expect payment, as significant time and cost to Plaintiff incurred, and the work was primarily for the benefit of Defendant.

---

[2] Plaintiff acknowledges that the Court has dismissed count 5 - Massachusetts Wage Act.

129.  Plaintiff's second application of Quantum Meruit is based on Defendant's instruction to Plaintiff to perform work assisting Defendant after Plaintiff's termination. Defendant made several overtures to Plaintiff regarding re-employment for his assistance, with back wages for Plaintiff's time spent in assisting with the investigation. It is reasonable for Plaintiff to expect payment, as significant time and cost to Plaintiff incurred, and the work was primarily for the benefit of Defendant.

## Seventh Claim for relief [3]
## Copyright Infringement

For an seventh claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 129, inclusive of this complaint, and further states and alleges as follows:

130.  Defendant failed to compensate Plaintiff for Photographic work performed by Plaintiff. Several of the photo shoots were completed outside of Plaintiff's normal working hours. Under the provisions of 17 U.S.C. § 201(a), 17 U.S.C. § 102(a), 17 U.S.C. § 103, and 17 U.S.C. 106, Plaintiff holds the right to all works for which no remuneration has been made.

131.  Defendant knowingly and willfully distributed photographic works for which no remuneration was made to Plaintiff. This is in violation of 17 U.S.C. § 501(a).

132.  Plaintiff asserts his rights under 17 U.S.C. § 501(b).

133.  Defendant is subject to, and Plaintiff seeks relief under, the provisions of 17 U.S.C. § 502, 17 U.S.C. § 503(a), 17 U.S.C. § 504(a), and 17 U.S.C. § 505.

## Eighth Claim for relief
## Breach of Implied Covenant of Good Faith and Fair Dealing

For an eighth claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 133, inclusive of this complaint, and further states and alleges as follows:

134.  Defendant entered into written and/or oral contracts with Plaintiff and each party's acceptance was supported by good and valuable consideration.

135.  Plaintiff fulfilled his contractual obligation by laboring for the benefit of Defendant.

---

[3] Plaintiff acknowledges that the Court has dismissed this count - Copyright Infringement (Original Complaint count 8).

136. Defendant, in bad faith, denied Plaintiff the benefit of the contract by failing to pay the contractually established wages and reimburse expenses, and failing to pay sales award money, while continually acknowledging that payment was due and payable to Plaintiff.

137. Defendant's bad faith is demonstrated by Defendant's failure to pay contractually required wages, failure to pay statutorily mandated overtime, failure to pay sales award money, and failure to reimburse Plaintiff for personal funds expended for the benefit of Defendant.

138. Defendant outlined clear instruction regarding improprieties through the promulgation of its personnel policies and procedures, Associate Handbook, and pamphlets, Ethics posters, training classes, and Open Door Policy. Plaintiff fulfilled his contractual obligations by following outlined procedures regarding the discovery of said improprieties.

139. Defendant acted in bad faith by retaliating against Plaintiff for fulfilling his contractual obligations and in violation of Defendant's clear, definite promise that it would not retaliate against employees for using the internal complaint procedure.\

140. Defendant was motivated by improper reasons to suspend Plaintiff without pay for asserting his rights as a citizen of the Commonwealth of Massachusetts and in violation of Public Policy.

141. Defendant was motivated by improper reasons to terminate Plaintiff as:

Defendant terminated Plaintiff to avoid paying contractually required wages, failure to pay statutorily mandated overtime, failure to pay sales award money, and failure to reimburse Plaintiff's expenses.

and

Defendant terminated Plaintiff for asserting his rights as a citizen of the Commonwealth of Massachusetts and in violation of Public Policy.

142. Due to Defendant's breach of the implied covenant of good faith and fair dealing, Plaintiff suffered from loss of actual wages and expenses, statutorily mandated overtime, sales award money, stock options, and continues to suffer loss of wages and benefits, and stock options, and other general and specific damages, all in an amount and of a nature to be determined according to proof at time of trial.

## Ninth Claim for relief
## Negligent Misrepresentation

For a ninth claim of relief against Defendant, Plaintiff adopts and incorporates by reference herein the allegations contained in Paragraphs 1 through 142, inclusive of this complaint, and further states and alleges as follows:

143. Defendant presented its contractors, specifically but not limited to J & J Contracting, as licensed and insured in the Commonwealth of Massachusetts. Defendant was fully aware that not all contractors were licensed and/or insured, and took active steps to shield this information from the Plaintiff. Further, Defendant was fully aware that permits which were required by Massachusetts law were not being obtained and that customers were being charged for said permits, with no money refunded to the customers for said charges after permits were not obtained.

144. Defendant also stated that all changes to construction projects were being processed solely by Plaintiff per company policy, while shielding Plaintiff from expenditures made in violation of said policies.

145. Plaintiff relied on the information provided by Defendant to his detriment, placing Plaintiff at risk of being an unwitting participant in defrauding customers and violating Massachusetts Law.

146. Upon discovery of Defendant's improprieties, Plaintiff (per policy) exposed the improprieties at various times to supervisors, store management, Human Resources, senior management, executive management, the internal hotline, and government authorities. Although Defendant was fully aware of the truthfulness of Plaintiff's statements at the time as it possessed physical evidence in support of Plaintiff's statements, Defendant withheld said physical evidence of the improprieties from Plaintiff.

147. Plaintiff was placed on unpaid leave for several weeks, and upon his return to work was placed in a workplace approximately three times the distance from his home as his original workplace, with increased commuting costs to be borne by Plaintiff. Plaintiff's company phone was returned due to the relocation, and a new phone which was to be reissued at his new office was never assigned, leaving Plaintiff to bear the costs of using his personal cell phone for company business. (All other same-position employees were assigned company phones.)

148. Plaintiff suffered and continues to suffer from both monetary losses and emotional distress due to Defendant's misrepresentations.

149. Defendant also entered into contract with Plaintiff for work to be completed for payment. Defendant made clear and concise statements regarding said payments on an ongoing basis throughout Plaintiff's employment. Defendant engaged in several discussions with Plaintiff (initiated at different times by either party) regarding said payments. Defendant directed Plaintiff to complete the work, submit a log of the hours worked, and stated that all hours worked would be paid. Defendant further agreed to pay Plaintiff for individual works, and made clear and concise statements regarding payment for services rendered.

150. From 2004 through August of 2005 (eight months after Plaintiff's termination), Defendant made numerous statements to Plaintiff that he would be paid "as a photographer". These statements were made by both Noel Alvarez and Emery Cooper.

151. Plaintiff relied on Defendant's statements to his detriment, having received no remuneration whatsoever for the work performed. Plaintiff took Defendant's statements to be true and reliable in performing services, using his own equipment, making personal expenditures, and submitting physical goods for which Defendant defaulted on payment. Due to Defendant's numerous extraordinary exclamations by senior executives up to and including the company president regarding payments to be made (through August, 2005), Plaintiff relied on this information as true and factual, and filed no claims with Massachusetts Government agencies due to Defendant's misrepresentations.

152. Plaintiff suffered and continues to suffer loss of wages and expenses due to his reliance on Defendants statements.

**WHEREFORE,** Plaintiff respectfully prays that this Court:

A.   Enter judgment in favor of Plaintiff and against Defendant for compensatory damages, in an amount to be proven at trial;

B.   Enter judgment in favor of Plaintiff and against Defendant for punitive or exemplary damages, in an amount to be determined at trial;

C.   Declare that Defendants' unauthorized conduct violates Plaintiffs' rights under the Federal Copyright Act;

D.   Immediately and permanently enjoining Defendants from copying or republishing any of Plaintiffs' copyrighted photographs;

E.   Enter judgment in favor of Plaintiff and against Defendant for statutory damages for copyright infringement, in an amount to be determined at trial;

F.   Enter judgment in favor of Plaintiff and against Defendant for actual damages for copyright infringement, in an amount to be determined at trial;

G.   Grant to Plaintiff any attorney's fees he may incur, plus his costs, expert witness fees, disbursements, and pre- and post-judgment interest; and

H.   Grant such other and additional relief as may to this court seem proper.

Respectfully submitted,

Mark Saunders
28 Cushman Street
Watertown, Massachusetts 02472-3704
617-905-7454

DATE: 1/16/09

**PLAINTIFF DEMANDS TRIAL BY JURY ON ALL ISSUES RAISED HEREIN**

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of January, 2009, a copy of the foregoing FIRST AMENDED COMPLAINT was deposited in the United States Mail, postage prepaid, addressed to the following:

Joseph P. McConnell
Jeffery S. Siegel
200 State Street
Boston, MA 02109